**DAVID ROSENFELD**
**ASSOCIATE REGIONAL DIRECTOR**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**Three World Financial Center, Suite 400**
**New York, New York 10281 (212) 336-0153**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| -against- | :     **09-CV-2518 (CM)** |
| | : |
| **HENRY MORRIS, DAVID J. LOGLISCI, BARRETT N.** | :     <u>**THIRD AMENDED COMPLAINT**</u> |
| **WISSMAN, RAYMOND B. HARDING, SAUL M. MEYER,** | : |
| **JULIO RAMIREZ, JR., NOSEMOTE LLC, PANTIGO** | : |
| **EMERGING LLC, PURPOSE LLC, FLANDANDA** | : |
| **HOLDINGS LTD., TUSCANY ENTERPRISES LLC, W** | : |
| **INVESTMENT STRATEGIES LLC, HFV** | : |
| **MANAGEMENT, L.P., HFV ASSET MANAGEMENT,** | : |
| **L.P., and ALDUS EQUITY PARTNERS, L.P.,** | : |
| | : |
| **Defendants.** | : |

---

Plaintiff Securities and Exchange Commission ("Commission"), for its third amended

complaint against defendants Henry Morris ("Morris"), David J. Loglisci ("Loglisci"), Barrett N.

Wissman ("Wissman"), Raymond B. Harding ("Harding"), Saul M. Meyer ("Meyer"), Julio

Ramirez, Jr. ("Ramirez"), Nosemote LLC ("Nosemote"), Pantigo Emerging LLC ("Pantigo"),

Purpose LLC ("Purpose"), Flandana Holdings Ltd. ("Flandana"), Tuscany Enterprises LLC

("Tuscany"), W Investment Strategies LLC ("W Investment"), HFV Management, L.P. ("HFV

Management"), HFV Asset Management, L.P. ("HFV Asset Management"), and Aldus Equity

Partners, L.P. ("Aldus") (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     This action involves a fraudulent scheme to extract kickbacks from investment management firms seeking to manage investment assets held by the New York State Common Retirement Fund ("Retirement Fund") in trust for New York state employees, retirees and other beneficiaries. Morris, Loglisci, Wissman, Harding, Meyer, and Ramirez initiated, directed, implemented, participated in and/or benefited from the scheme. During the relevant period, Loglisci served as the State of New York's Deputy Comptroller and Chief Investment Officer ("CIO"), and Morris was the top political advisor and chief fundraiser for Alan Hevesi, who was the State of New York's Comptroller from January 2003 through December 2006. Wissman was a hedge fund manager during the relevant period and is a longtime family friend of Loglisci, while Harding is the former leader of the New York State Liberal Party and a longtime political associate of Morris. Meyer was the managing partner of Aldus, an investment management firm that managed Retirement Fund assets and made kickback payments to Morris. Ramirez, a friend and associate of Morris, helped Morris extract the kickback payments from Aldus and received a portion of these illicit payments. As described below, the Defendants' scheme corrupted the integrity of the Retirement Fund's investment processes and resulted in Retirement Fund assets being invested with the purpose of enriching the Defendants.

2.     Pursuant to the Defendants' scheme, Loglisci caused the Retirement Fund to invest billions of dollars with investment management firms that together paid millions of dollars to Morris, Wissman, Harding and others in the form of sham "finder" or "placement agent" fees in order to obtain those investments from the Retirement Fund. These payments to

2

Morris, Wissman, Harding and others were, in fact, little more than kickbacks that were made

pursuant to undisclosed *quid pro quo* arrangements or were otherwise fraudulently induced by

the Defendants. Morris, Wissman, Harding and others who received these sham payments did

not perform *bona fide* finding, placement or other services in exchange for the payments, and

Loglisci would not approve a Retirement Fund investment in those instances unless Morris,

Wissman, Harding or certain others were paid by the investment management firm. In many

such instances, the investment management firm personnel, including Meyer, knew or were at

least reckless in not knowing that Loglisci would not approve the proposed investment absent an

agreement to pay Morris, Wissman or certain other persons. In fact, the Defendants often

arranged for Morris, Wissman, Harding or others to receive "finder" or "placement agent" fees

on deals in which the investment manager already had a relationship with the Retirement Fund

or was already negotiating an investment with Loglisci. In one instance, Wissman caused two

investment management firms with which he was affiliated at the time, defendants HFV

Management and HFV Asset Management, to pay "finder" fees to Morris even though Wissman

had a close relationship with Loglisci and had already discussed the proposed investment with

him. Similarly, Meyer caused Aldus to pay sham fees to Morris because Ramirez, acting on

Morris's behalf, informed Meyer that Aldus needed to do so in order to obtain a Retirement

Fund investment. Meyer paid these fees to Morris even though Aldus was already serving as a

private equity consultant to the Retirement Fund and was already negotiating with the

Retirement Fund's investment staff about the proposed investment before Meyer had ever met

Morris.

      3.     To avoid detection of their scheme, Morris and Wissman often directed the

investment managers to make payments to multiple offshore and other entities controlled by
Morris, including defendants Nosemote, Pantigo, and Purpose (collectively the "Morris
Entities"), or to entities controlled by Wissman, including defendants Flandana, Tuscany, and W
Investment (collectively the "Wissman Entities"). In some instances, Loglisci, Morris and
Wissman concealed Morris's role in the transaction from the investment management firms that
paid the fees by making misrepresentations about Morris's involvement and covertly using one
of the Morris or Wissman Entities as an intermediary to funnel payments to Morris.

4.      Although Loglisci knew the true purpose of the payments at issue, neither he nor
any of the Defendants, nor the investment management firms that made the payments, disclosed
the true nature of the payments or the underlying arrangements to relevant members of the
Comptroller's investment staff or to the Retirement Fund's Investment Advisory Committee
("IAC"), a statutory body charged with monitoring and advising the Comptroller's office
regarding the Retirement Fund's investments, reviewing the Retirement Fund's investment
policies and making any necessary recommendations. As a result of those omissions and the
Defendants' scheme, relevant members of the Comptroller's investment staff and the IAC were
deprived of material information that they needed to carry out their duties and the Retirement
Fund was thus deprived of material information when making investment decisions, *i.e.* that
Loglisci's decision to invest Retirement Fund assets with certain investment management firms
was based on the firms' willingness to enrich Morris, Wissman, Harding and certain others,
rather than on Loglisci's independent assessment of the merits of such an investment free from
any conflicts of interest. The IAC and relevant members of the Comptroller's staff were
unaware that Loglisci ensured that those investment managers that made the requisite payments

4

to Morris, Wissman, and Harding, as well as other recipients designated by Morris and Loglisci, were rewarded with very lucrative investment management contracts and denied business to those investment managers that declined to make such payments.

5.    By virtue of the foregoing conduct:

(a)    Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and each of them is also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by other Defendants and by other persons described herein;

(b)    Harding and Ramirez are liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Harding aided and abetted violations committed by Morris and Loglisci, while Ramirez aided and abetted violations committed by Morris, Loglisci, Meyer and Aldus;

(c)    Morris, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)];

(d)    HFV Management and HFV Asset Management violated Sections 17(a)(2) and 17(a)(3) of the Securities Act and Section 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(2)];

5

(e)     Aldus directly or indirectly, singly or in concert, violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)]; and

(f)     Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Ramirez are liable for aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)] by certain persons described herein, including Aldus.

6.     Unless each of the Defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], seeking to restrain and enjoin permanently the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein. The Commission also seeks a final judgment ordering certain of the Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering certain of the Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and/or Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and in the case of certain of the Defendants, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

8.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)],

6

Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa], and Section 214 of

the Advisers Act [15 U.S.C. § 80b-14]. The Defendants, directly or indirectly, singly or in

concert, have made use of the means or instruments of transportation or communication in, and

the means or instrumentalities of, interstate commerce, or of the mails, in connection with the

transactions, acts, practices, and courses of business alleged herein. Some of these transactions,

acts, practices and courses of business occurred in the Southern District of New York, where

each of the Defendants transacted business during the relevant period. The Comptroller of the

State of New York maintains an office in New York, New York, and Loglisci worked in that

office during the relevant period. In addition, Morris and Harding resided and maintained

offices in New York, New York, and the principal places of business of Nosemote and Purpose

are located in New York, New York.

## THE DEFENDANTS

9.    **Morris**, age 55, resides in New York City and East Hampton, New York. From

June 2003 through August 2008, Morris was a registered representative associated with Searle

& Co. ("Searle"), a Connecticut-based broker dealer and investment adviser. Morris holds

Series 7 and 63 licenses. He is also an attorney licensed to practice law in New York.

10.    **Loglisci**, age 39, resides in Norwalk, Connecticut. Beginning in 2003, he served

as the Director of Alternative Investments for the Comptroller of the State of New York,

overseeing investments in private equity funds. In April 2004, Loglisci was promoted to Deputy

Comptroller and CIO and served in that position until his resignation in mid-2007. He then

worked briefly for a hedge fund sponsor. From 1998 to 2002, he was an investment banker at a

major Wall Street firm and held a Series 7 license. Loglisci is an attorney licensed to practice

7

law in New York and Connecticut.

11.    **Wissman**, age 46, resides in Dallas, Texas.  During the relevant period, Wissman was a managing director and indirect part owner of defendants HFV Management and HFV Asset Management.  Wissman is associated with and controls defendants Flandana, Tuscany and W Investment.  Wissman has been a friend of the Loglisci family since 1992.

12.    **Harding**, age 74, resides in New York, New York and Austerlitz, New York. From 1983 through 2002, Harding was the leader of the New York Liberal Party.  The Liberal Party endorsed Hevesi in his 2002 campaign for Comptroller.  From April 2003 through January 2008, Harding held a Series 22 securities license and was associated with Potomac Capital Markets LLC ("Potomac"), a registered broker-dealer based in Frederick, Maryland.  Harding is also a partner in a law firm in New York and is licensed to practice law in New York.

13.    **Nosemote** is a New York limited liability company owned by Morris with a principal place of business in New York, New York.

14.    **Pantigo** is a New York limited liability company owned by Morris with a principal place of business in East Hampton, New York and other offices in New York, New York.

15.    **Purpose** is a New York limited liability company owned jointly by Nosemote and another limited liability company.  Purpose's principal place of business is located in New York, New York.

16.    **Flandana** is a Cyprus limited company that is owned by a Wissman family trust and controlled by Wissman.  Flandana's registered office is in Limassol, Cyprus.

17.    **Tuscany** is a U.S. Virgin Islands limited liability company owned, in part, and

8

managed by Wissman. Tuscany has an office address in St. Croix, U.S. Virgin Islands.

18.     **W Investment** is a U.S. Virgin Islands limited liability company that was solely owned by Wissman during a portion of the relevant period. W Investment's ownership was later transferred to Tuscany. W Investment is managed by Wissman and has an office address in St. Croix, U.S. Virgin Islands.

19.     **HFV Management** is a British Virgin Islands limited partnership with offices in Tortola, British Virgin Islands.

20.     **HFV Asset Management** is a limited partnership based in Dallas, Texas and registered with the Commission as an investment adviser.

21.     **Meyer**, age 38, resides in Dallas, Texas. Meyer is the managing partner and a founder of Aldus. Meyer is also a managing partner of Aldus Capital, LLC, a registered investment adviser. Meyer holds a Series 65 license and is licensed to practice law in the State of Texas, although his bar membership is currently inactive.

22.     **Aldus**, a Texas limited partnership based in Dallas, Texas, is an investment management and advisory firm specializing in private equity transactions. Aldus has over $6 billion under management and was registered as an investment adviser from its formation in 2003 until July 2007.

23.     **Ramirez**, age 48, resides in San Marino, California. From September 2005 through April 2009, Ramirez was a managing director of Park Hill Group LLC, a registered broker-dealer. From 2002 through early 2005, Ramirez was a principal of Wetherly Capital Group, LLC ("Wetherly"), an investment banking and consulting firm. During that time, Ramirez was also affiliated with DAV/Wetherly Financial, L.P., a registered broker-dealer

9

owned by Wetherly.  Ramirez holds Series 7 and 63 licenses.

## OTHER RELEVANT PERSONS AND ENTITIES

24.    **The Retirement Fund** is a public pension fund that during the relevant period

held over $150 billion in assets for more than one million New York State employees, retirees

and other beneficiaries.  The Retirement Fund is the largest pension fund in New York and the

third largest pension fund in the country.  Pursuant to New York statute, the Comptroller is the

sole trustee of the Retirement Fund.

25.    **Searle,** a Connecticut corporation with its principal place of business in

Greenwich, Connecticut, is registered with the Commission as a broker-dealer and an

investment adviser.

## THE DEFENDANTS' FRAUDULENT CONDUCT

**Background**

26.    Following the November 2002 election, Morris, who was a professional political

strategist and had little, if any, experience in the investment field, set himself up as a purported

"finder" or "placement agent" for private equity and hedge fund managers seeking investors.  In

mid-2003, Morris became associated with Searle and obtained his Series 7 license.  The lawful

receipt of finder or placement fees by an individual in connection with the purchase or sale of

securities typically requires association with a registered broker-dealer.  Searle agreed to let

Morris keep 90 to 95 percent of the fees Morris generated.  The typical role of a legitimate

finder or placement agent is to identify and introduce the client to potential investors and help

the client solicit the investors for business.  Genuine placement agents and finders often perform

a variety of specific services, such as helping to craft marketing materials and presentations to

investors.

**Overview Of The Scheme**

27.      Morris made over $15 million in purported placement and finder fees and other

illicit payments between January 2003 and June 2007, but Morris was rarely, if ever, paid for

providing legitimate finding or placement services. Instead, Morris schemed with Loglisci,

Wissman, Harding, and others to extract money from investment managers seeking to do

business with the Retirement Fund. Wissman received at least $12 million in sham finder fees

and other illicit payments pursuant to the scheme. Harding received approximately $800,000 in

sham finder fees and other illicit payments. Ramirez also benefited financially as a result of the

scheme.

28.      In a variety of different transactions and contexts, Morris, Loglisci, Wissman, and

Ramirez made clear, whether through classic "pay to play" tactics or other means, that

investment managers or their agents must pay a "fee" to Morris or, in other cases, to Wissman,

Harding, or certain others in order to obtain an investment from the Retirement Fund. As

detailed below, Loglisci repeatedly directed investment managers who solicited him for

investment business to Morris and Wissman, and signaled to the investment managers that they

first needed to "hire" Morris, Wissman or a certain other individual as a finder or placement

agent. Once a fee for Morris, Wissman or another designated individual was agreed upon,

Loglisci approved the proposed deal with the investment management firm. In accordance with

the Defendants' scheme, Loglisci failed to disclose, and took steps to conceal, these *quid pro

quo* arrangements and improper payments from other members of the Comptroller's investment

staff and the IAC. Although the investment managers who made the payments at issue were

11

obligated, contractually and otherwise, to make disclosures to the Retirement Fund about fees paid to finders, placement agents or other third parties in connection with the Retirement Fund's investments, those investment managers also failed to disclose to the IAC or other relevant members of the Retirement Fund's investment staff the true nature and intended beneficiary of the payments. By making investment decisions based on the investment managers' willingness to enrich Morris, Wissman, Harding and others, Loglisci abused his public office and he, Morris, Wissman, Harding, Meyer, and Ramirez, among others, defrauded the Retirement Fund.

29.     Loglisci also personally benefited from his role in the scheme. In addition to receiving Morris's support for his promotion to Deputy Comptroller and CIO, Loglisci benefited financially from the scheme by obtaining funding and distribution for a low budget film, titled *Chooch*, which Loglisci and his brothers produced. In or about February and March of 2004, Morris and the principal of a private equity firm seeking to do business with the Retirement Fund each separately invested $100,000 to help market and distribute *Chooch*. In January 2005, the affiliate of a private equity firm seeking to do business with the Retirement Fund agreed to a DVD distribution deal for *Chooch* worth approximately $90,000. Wissman had previously also invested at least $100,000 in *Chooch*. As described below, Loglisci steered Retirement Fund business to Wissman and arranged for Wissman to be paid by other investment managers.

30.     Morris, Wissman and Harding, as well as the others who received the payments at issue, did not perform legitimate placement or finder services for the investment management firms who made the payments, underscoring the *quid pro quo* nature of the Defendants' arrangements. None of the Defendants or anyone else who received the payments at issue introduced the investment managers to the Retirement Fund and, in some cases, the investment

12

managers had already hired a finder or placement agent of their own and were already negotiating an investment with Loglisci when they were told that they also needed to "hire" Morris, Wissman or another individual.

31.     Loglisci, Morris, Wissman and others involved in the scheme were careful to conceal anything that would indicate to other members of the Comptroller's investment staff that Morris was being paid by investment managers doing business with the Retirement Fund and thereby reveal their scheme. In fact, Morris paid the girlfriend of a high-ranking member of the Comptroller's staff nearly $100,000 in cash to ensure that the staff member would not ask questions or otherwise reveal the scheme to others. As the scheme progressed, Morris, Loglisci, Wissman and others involved in the scheme took additional steps to conceal the fraud, and Morris's role in particular. On some transactions, Loglisci and Wissman arranged for the investment manager to make the payment to Wissman, and Wissman would then covertly funnel a portion of the payment to Morris. In some of those instances, Loglisci and Wissman even hid Morris's involvement from the investment manager making the payment to Wissman.

32.     To further ensure that the payments made to Morris, Wissman, Harding and others remained secret, Morris, Loglisci, and Wissman also worked to circumvent the Retirement Fund's disclosure policy, which required investment managers to make written disclosure of all fees, including placement agent and finder fees, paid in connection with obtaining business from the Retirement Fund. To avoid meaningful disclosure and conceal the scheme, Morris and Wissman often arranged for the investment managers to make the payments to a web of offshore and other entities owned or controlled by Morris (*e.g.* Nosemote, Pantigo, and Purpose) or to Wissman or entities owned or controlled by Wissman (*e.g.* Flandana, Tuscany, and W

13

Investment). On at least one occasion, Loglisci directed an investment manager to identify only the entity through which Morris was being paid when the investment manager asked Loglisci whether Morris's name should be included on the disclosure form. Loglisci and Wissman further undercut the impact of even these opaque disclosures by instructing the investment managers to send the disclosure forms directly to Loglisci and not to copy any other members of the Comptroller's staff. These disclosure files disappeared when Loglisci left the Comptroller's office in mid-2007. In any event, the fact that payments to Morris, Wissman, Harding and certain other individuals were made pursuant to *quid pro quo* arrangements with Loglisci was never disclosed in any of the forms submitted by the investment managers or in any other way to the IAC or other relevant members of the Retirement Fund's investment staff.

33. Neither the IAC nor other relevant members of the Retirement Fund's investment staff were aware that those investment managers that agreed to make the requisite payments to Morris, Wissman, Harding and other recipients designated by Morris and Loglisci were rewarded by Loglisci with lucrative investment management contracts or that Loglisci denied business to those investment managers who declined to make such payments. In some cases, Loglisci arranged for the Retirement Fund to make substantial investments with investment managers who agreed to pay Morris, Wissman and certain others even though those managers had limited or spotty track records. As a result of the Defendants' scheme, Morris, Wissman, Harding and certain other individuals received sham placement or finder fees in connection with approximately $5 billion, or more than half, of the $9.5 billion in alternative investments made by the Retirement Fund during the relevant period.

14

**Illustrative Transactions**

34.     The following transactions illustrate how the scheme operated and the roles

played by Morris, Loglisci, Wissman, Harding, Meyer, and Ramirez:

**HFV Multi-Strategy Fund**

35.     In or about June of 2003, Morris first met Wissman, who was associated with

certain hedge fund managers, including HFV Management and HFV Asset Management.  The

Retirement Fund was not yet investing in hedge funds at that time, but Wissman had identified

the Retirement Fund as a potential investor before he met Morris and already had a relationship

with Loglisci, who was a family friend.  Nevertheless, Morris solicited a payment from

Wissman in exchange for causing the Retirement Fund to expand its investment portfolio to

include hedge funds and to invest in a fund managed by a firm with which Wissman was

associated.  When Wissman asked Loglisci about Morris's proposition, Loglisci confirmed that

Morris would need to be paid in order for Wissman to secure the desired investment from the

Retirement Fund.  In later conversations, Loglisci clearly indicated to Wissman that to obtain a

substantial investment from the Retirement Fund, an investment manager must first agree to pay

Morris.  Wissman agreed to do so and, as a result, HFV Management became one of the first

hedge fund managers to receive business from the Retirement Fund.

36.     Pursuant to the foregoing arrangement among Morris, Loglisci and Wissman,

HFV Management, through Wissman, entered into a written agreement in November 2004 to

pay Nosemote, one of the defendant entities owned by Morris, a purported "finder fee" equal to

ten percent of the net management and performance fees that the Retirement Fund paid to HFV

Management for managing Retirement Fund assets.  In exchange, in January 2005, Loglisci

15

arranged for the Retirement Fund to make one of its first hedge fund investments by buying $50 million worth of shares of HFV Multi-Strategy Fund, Ltd. ("HFV Fund"), a fund managed by HFV Management that invested in hedge funds. Despite the HFV Fund's lackluster performance, Loglisci invested another $50 million of Retirement Fund assets in the HFV Fund in three further purchases of shares from June 2006 through January 2007.

37.     HFV Management's obligation to pay Nosemote was later assigned to Flandana, an offshore entity controlled by Wissman, and then transferred to HFV Asset Management, with which Wissman was also associated at the time. At the same time that HFV Asset Management assumed this obligation, Nosemote's right to receive payment was transferred to Searle, the broker-dealer with which Morris was associated. In exchange for the Retirement Fund's $100 million purchase of shares in the HFV Fund, Wissman caused Flandana and HFV Asset Management together to pay Morris, through Nosemote and Searle, a total of approximately $600,000.

38.     As Morris, Loglisci and Wissman fully understood and intended, the foregoing payments were, in fact, nothing more than a kickback paid to Morris in exchange for Loglisci agreeing to approve an investment with HFV Management. Morris did not perform any of the services that genuine placement agents and finders typically provide. Given Wissman's relationship with Loglisci, Wissman did not need, and did not obtain through Morris, an introduction to the Comptroller's staff. In fact, as discussed with respect to some of the transactions described below, Loglisci's relationship with Wissman eventually led Loglisci and Morris to include Wissman in their scheme, with Morris and Wissman often working together to extract payments from investment management firms and then splitting those payments. After

16

Loglisci made clear to Wissman that investment management firms must pay Morris in order to secure certain types of Retirement Fund investments, Wissman entered into an informal partnership with Morris. Wissman agreed to identify investment managers who might be soliciting the Retirement Fund and arrange for them to pay Morris. In exchange, Morris agreed to give Wissman half of any of the payments that Wissman was able to extract from such managers.

### Liberty Oak Capital Fund

39.     Because the Retirement Fund had not previously invested in hedge funds, Loglisci had been required to take certain steps before approving the Retirement Fund's investment with HFV Management. Among other things, Loglisci needed to retain a hedge fund consultant to educate the investment staff about the basics of hedge fund investing and, as required by the Retirement Fund's policies and procedures, vet the investment programs of the hedge funds in which Loglisci wished to invest Retirement Fund assets.

40.     In mid-2005, the hedge fund consultant that Loglisci had retained, Consulting Services Group, LLC ("CSG"), approached Loglisci about managing a portion of the Retirement Fund's hedge fund portfolio. Loglisci told a managing director for CSG that CSG would first need to agree to pay Morris. Although CSG had been the Retirement Fund's hedge fund consultant since 2003 and had a close working relationship with the Comptroller's investment staff, Loglisci made it clear to CSG's managing director that CSG still needed to "hire" Morris as a "finder" in order for CSG to secure investment business from the Retirement Fund. Loglisci indicated, in substance, that while Loglisci supported an investment with CSG, all investment decisions had to be officially approved and that CSG needed to have a deal to pay

17

Morris to obtain such approval. Loglisci ceased further discussions with the managing director

for CSG concerning CSG's proposal until CSG agreed to pay Morris.

41. The managing director for CSG subsequently met with Morris and, as directed by

Morris, CSG entered into a written agreement with Searle in July 2005 in which CSG agreed to

pay Searle an amount equal to thirty percent of the management fees that CSG received from the

Retirement Fund for managing Retirement Fund assets. After the managing director reported to

Loglisci that CSG had agreed to pay Morris, Loglisci resumed discussions with CSG and

arranged for the Retirement Fund to hire CSG to create and manage an investment fund

exclusively for the Retirement Fund, named Liberty Oak Capital Fund, L.P. ("Liberty Oak

Fund"). Pursuant to this undisclosed *quid pro quo* arrangement, the Retirement Fund purchased

a $635 million limited partnership interest in the Liberty Oak Fund between July and December

of 2006 and another $130 million interest in June 2007. In exchange, CSG paid a total of

approximately $1.15 million to Searle, 95 percent of which went to Morris pursuant to Morris's

arrangement with Searle.

42. The Liberty Oak Fund's holdings consisted of the shares of multiple hedge funds

that traded in various securities, and the Retirement Fund was the only limited partner in the

Liberty Oak Fund. CSG was the general partner of the Liberty Oak Fund, and the contract

through which the Retirement Fund purchased the sole limited partnership interest in the Liberty

Oak Fund explicitly stated that CSG owed fiduciary duties directly to the Retirement Fund. As

described above, CSG consulted directly with the Retirement Fund and, based on those

consultations, created an investment portfolio that was specifically designed to achieve the

Retirement Fund's investment objectives.

43.    Given that CSG already had a strong relationship with Loglisci and other senior members of the Comptroller's investment staff, the statements by Loglisci and Morris regarding the need for CSG to engage Morris as a "finder" amounted to a kickback demand. Morris did not need to, and did not, introduce CSG to the Retirement Fund or perform any other legitimate placement or finding services for CSG.

**Selection Of Aldus As The Emerging Fund Manager**

44.    Morris and Loglisci punished investment managers who refused to pay off Morris or Wissman. There were instances in which Loglisci, in breach of his duty to act in the best interests of the Retirement Fund by making decisions based solely on the merits of a proposed investment, abruptly ended talks with investment managers who were unwilling to cut Morris or Wissman in on a deal and instead hired investment managers who were willing to do so. For example, Loglisci selected Aldus to design and manage a newly formed portfolio of funds managed by minority group members and other "emerging" fund managers because Meyer, unlike another investment manager also seeking to be hired for that role, was willing to have Aldus pay Morris.

45.    In or about early 2004, Loglisci met with a managing director of a minority-owned private equity firm to explore the possibility of that firm creating and managing a "fund of funds" through which the Retirement Fund would invest in minority-owned and other recently-launched private equity funds. After that private equity firm had several meetings with Loglisci and other members of the Comptroller's staff, Wissman contacted the private equity firm's managing director and demanded that the firm pay himself and Morris one-half of the management fees that the firm would earn on the proposed "emerging" fund investment.

19

Wissman warned the managing director that retaining Morris was "very important" to the

process of securing an investment from the Retirement Fund, but the private equity firm refused

to cut Morris and Wissman in on the deal. Upon learning of the private equity firm's refusal,

Loglisci angrily confronted the managing director and, in substance, insisted that the firm

needed to reach an agreement with Wissman, which Loglisci knew would result in a payment to

Morris. When the managing director again refused, Loglisci terminated discussions between the

Comptroller's staff and that private equity firm.

46.     After rejecting the foregoing private equity firm, Loglisci and Morris recruited

Aldus, which already served as a consultant to the Retirement Fund on certain private equity

transactions, to manage the Retirement Fund's emerging fund portfolio. At or about the time

that Aldus was approached about managing the Retirement Fund's emerging fund portfolio,

Morris contacted Ramirez, his friend and associate, and informed Ramirez that Aldus was being

considered for this role. Morris and Ramirez were friends who initially met through a mutual

contact and then worked in similar circles trying to parlay their political contacts into lucrative

careers deriving fees from investment managers seeking public pension fund investments.

Aware that Ramirez knew Meyer, Morris directed Ramirez to inform Meyer that Aldus must

retain Morris as a "finder" in order to obtain the Retirement Fund's business. By the time

Ramirez contacted Meyer about the need for Aldus to retain Morris and Meyer met with Morris,

Meyer had already engaged in negotiations with the Comptroller's staff about the project.

Meyer nevertheless agreed that Aldus would pay Morris after Ramirez made clear to Meyer that

Aldus, which was not minority-owned and did not have an established track record, would not

be hired by the Retirement Fund without such an agreement.

20

47.     Pursuant to the foregoing arrangement, in May 2004, Aldus entered into a written agreement with Pantigo, one of the defendant entities owned by Morris, in which Aldus agreed to pay Pantigo an amount equal to 35 percent of the management fees that Aldus received from the Retirement Fund. Meyer provided Loglisci with a copy of the written agreement between Aldus and Pantigo. As a result of that agreement, Loglisci arranged for the Retirement Fund to invest with Aldus. The Retirement Fund purchased a $175 million limited partnership interest in the Aldus/NY Emerging Fund, L.P. ("Emerging Fund"), an "emerging" fund that Aldus specifically designed and created for the Retirement Fund, in December 2004 and an additional $200 million interest in February 2006. In exchange, Aldus paid a total of $319,374 to Pantigo, which represented 35 percent of the fees that the Retirement Fund paid to Aldus. To compensate Ramirez for his assistance in securing this payment, Morris shared a portion of the payment with Ramirez. Meyer knew that Ramirez was also being paid in connection with this transaction.

48.     Although the written agreement between Aldus and Pantigo stated that Pantigo would be assisting with the creation and formation of the Emerging Fund, Aldus subsequently sent a letter to Loglisci stating that Aldus paid "marketing" fees to Pantigo. As Meyer, Loglisci and Morris all well knew, the descriptions of Pantigo's services in both of these documents were false, as neither Morris nor anyone else at Pantigo performed any legitimate services for Aldus. Aldus's letter did not disclose, among other things, that the payments to Pantigo were, in fact, kickback payments that Aldus made to Morris pursuant to a *quid pro quo* arrangement, and that Ramirez was also being paid pursuant to this arrangement. As described above, the disclosure files kept by Loglisci disappeared when he left the Comptroller's office in 2007.

21

49.     The Emerging Fund's holdings consisted of shares of emerging private equity funds that traded in various securities, and the Retirement Fund was the only limited partner in the Emerging Fund. Aldus was the general partner of the Emerging Fund, and the contract through which the Retirement Fund purchased the sole limited partnership interest in the Emerging Fund expressly stated that Aldus owed fiduciary duties directly to the Retirement Fund. As described above, Aldus consulted directly with the Retirement Fund and, based on those consultations, created an investment portfolio that was specifically designed to achieve the Retirement Fund's investment objectives.

50.     In or about late 2005, Aldus was contemplating an acquisition transaction with a large investment bank and Meyer told Wissman that he wanted to extricate Aldus from its arrangement with Morris. When Wissman relayed Meyer's request to Morris, Morris confirmed the true nature of his role. Morris told Wissman, in substance, to inform Meyer that Morris could take the Retirement Fund's business away from Aldus just as quickly as he had given it to Aldus.

### Other Improper Transactions Involving The Emerging Fund

51.     Morris and Loglisci also used their leverage with Aldus to extract kickbacks in connection with investment opportunities that fell below the minimum amount required for the Retirement Fund to make a direct investment. For example, in 2006, Loglisci pressured Meyer to have the Emerging Fund invest in a certain smaller private equity fund, Falconhead Capital Partners II, L.P. ("Falconhead Fund"), after Loglisci had already arranged for the private equity firm that managed the Falconhead Fund, Falconhead Capital LLC ("Falconhead"), to pay Morris in exchange for such an investment.

22

52.     In or about April 2006, a senior officer of Falconhead ("Falconhead Executive")
approached a senior official at the Comptroller's office about investing Retirement Fund money
with Falconhead. Once Loglisci learned of this contact, Loglisci immediately tipped Wissman
off about Falconhead's interest in doing business with the Retirement Fund. One day after the
Falconhead Executive approached the senior official at the Retirement Fund, Wissman
contacted the Falconhead Executive and informed him that Falconhead needed to retain Morris
as a finder in order to secure an investment of Retirement Fund assets. Although Falconhead
had already retained a large and well-known investment bank as its placement agent, the
Falconhead Executive agreed that Falconhead would pay Morris through Searle. Morris agreed
to split this payment with Wissman.

53.     After Falconhead agreed to pay Searle two percent of any amount invested by the
Retirement Fund, Loglisci referred the Falconhead Executive to Meyer and made clear to Meyer
that Loglisci wanted Aldus to cause the Emerging Fund to invest a portion of the money that the
Emerging Fund had received from the Retirement Fund in the Falconhead Fund. As a result, the
Emerging Fund invested $15 million of Retirement Fund assets in the Falconhead Fund, a
limited partnership managed by Falconhead, in November 2006 and another $15 million in May
2007 by purchasing limited partnership interests in the Falconhead Fund.

54.     As the foregoing demonstrates, the Defendants subverted the Retirement Fund's
investment procedures for the sole purpose of extracting kickback payments for Morris and
Wissman from Falconhead. Rather than identifying prospective investors for Falconhead,
Morris and Wissman, acting on Loglisci's tip, simply intercepted Falconhead after the firm had
already proposed an investment for the Retirement Fund's consideration. Loglisci then used his

23

influence with Aldus to have Aldus cause the Emerging Fund to consummate the transaction that would generate the sham "finder" fees for Morris and Wissman.

55.     Morris and Loglisci similarly misused the Emerging Fund to enrich Morris in a transaction in which Aldus and another smaller investment management firm did not even know that Morris was being paid. In April 2005, Loglisci arranged for Meyer to cause the Emerging Fund to make a $20 million investment with that other firm because, unbeknownst to either the other firm or Aldus, the other firm's placement agent had already agreed to pay Morris 40 percent of any fees the placement agent received in connection with a Retirement Fund investment. As a result of the Emerging Fund's investment with the other firm, Morris was paid approximately $80,000.

### Odyssey Investment Partners Fund

56.     In some instances, Morris contacted investment managers directly and negotiated the fraudulent arrangements on his own. In 2004, for example, Morris reached out to a managing director of Odyssey Investment Partners, LLC ("Odyssey") and told the managing director that the Retirement Fund had its "own" placement agent -- Searle -- that investment managers had to retain in order to obtain business from the Retirement Fund. Although Odyssey had already retained a large and well-known investment bank as its placement agent, the Odyssey managing director agreed that Odyssey would also pay Searle on any investment that Odyssey received from the Retirement Fund.

57.     In July 2004, Odyssey entered into a written agreement with Searle in which Odyssey agreed to pay Searle two percent of any amount that the Retirement Fund invested with Odyssey. Other than by executing the contract retaining Searle, neither the Odyssey managing

24

director nor anyone else at Odyssey ever had dealings with anyone at Searle other than Morris,
and Morris never disclosed his affiliation with Searle to the Odyssey managing director or
anyone else at Odyssey.

58.     Shortly after Odyssey agreed to pay Searle, Loglisci arranged for a "fund of
funds" limited partnership that managed certain investments exclusively for the Retirement
Fund to purchase a $20 million limited partnership interest in Odyssey Investment Partners
Fund III, L.P., a fund managed by Odyssey.  That transaction closed in March 2005.  As a result,
Odyssey paid $400,000 to Searle even though neither Morris nor anyone else at Searle ever
performed any placement or other services in connection with the Retirement Fund's
investment.

**Strategic Co-Investment Partners**

59.     In at least one instance, Loglisci enriched Morris and Wissman by demanding that
investment managers seeking to do business with the Retirement Fund include Morris and
Wissman as partners in the investment managers' proposed ventures.  During the summer and
early fall of 2005, Pacific Corporate Group Capital Partners ("PCG"), a private equity firm that
already managed certain Retirement Fund investments, and Clinton Group, Inc. ("Clinton"), a
hedge fund management firm, separately approached Loglisci to solicit investments from the
Retirement Fund.  After separately speaking with a managing director of PCG ("PCG
Executive") and a senior officer of Clinton ("Clinton Executive"), with whom Loglisci was
friends, Loglisci suggested to both of them that they join forces to create a new co-investment
vehicle that would invest Retirement Fund money in private equity transactions.  In January
2006, after further discussions about the proposed joint venture, Loglisci and Wissman met with

25

the Clinton Executive. At the meeting, Loglisci made clear to the Clinton Executive that the joint venture must include both Morris and Wissman for the Retirement Fund to invest. Wissman subsequently relayed this same message to the PCG Executive as well.

60.     Shortly thereafter, the Clinton Executive and the PCG Executive agreed to cut both Morris and Wissman in on the profits from the joint venture that Clinton and PCG ultimately put together in the form of a limited partnership known as Strategic Co-Investment Partners, L.P. ("Strategic Co-Investment"). W Investment, which Wissman initially owned outright and later controlled through his ownership interest in Tuscany, received a free 10 percent ownership stake in the management entity to which the Retirement Fund paid management fees, Strategic Co-Investment Partners Management, LLC ("Strategic Co-Investment Management"), with the understanding that W Investment would pass half its profits on to Morris. In exchange, Loglisci arranged for the Retirement Fund to invest approximately $750 million in Strategic Co-Investment by acquiring a sole limited partnership interest in October 2006. As a result, in late 2006 and 2007, Strategic Co-Investment Management paid W Investment a total of $1.26 million in periodic distributions even though neither Wissman nor W Investment had provided any services in exchange for the distributions. The Clinton Executive was the sole member of Strategic Co-Investment Management's managing member and the PCG Executive, who by then had left PCG, was a managing director of Strategic Co-Investment Management's managing member and managed Strategic Co-Investment Management's day-to-day activities.

61.     Strategic Co-Investment invested in other companies through various means, including the purchase of securities, and the Retirement Fund was the only limited partner in

Strategic Co-Investment. Strategic Co-Investment Management was hired by the general partner of Strategic Co-Investment, and the contract through which the Retirement Fund purchased the sole limited partnership interest in Strategic Co-Investment provided that Strategic Co-Investment Management owed fiduciary duties directly to the Retirement Fund. Clinton, PCG, and Strategic Co-Investment Management consulted directly with the Retirement Fund and, based on those consultations, created an investment portfolio that was specifically designed to achieve the Retirement Fund's investment objectives.

62.     To ensure that the Retirement Fund made the investment and that Morris and Wissman received their money, Loglisci ignored obvious shortcomings in the investment proposal and circumvented internal procedures, thereby acting contrary to the Retirement Fund's best interests. Clinton was a hedge fund manager with little or no experience in managing the type of private equity venture that was being proposed. Rather than engaging the Retirement Fund's usual private equity consultant to conduct the requisite due diligence and otherwise vet the proposed transaction, Loglisci instead assigned the project to Aldus, which was also used by the Retirement Fund as a private equity consultant (see ¶ 46 above). Although Aldus initially balked at endorsing the deal, Aldus ultimately bowed to pressure from Loglisci and agreed to issue a qualified report that was nevertheless sufficient to allow Loglisci to invest Retirement Fund money in Strategic Co-Investment.

63.     Loglisci and the other individuals involved in this transaction took steps to conceal Morris's role from Aldus, which had inquired into the ownership of Strategic Co-Investment and Strategic Co-Investment Management. Aldus specifically asked Wissman, the PCG Executive and the Clinton Executive for a representation that there were no undisclosed

27

agreements to pay third parties. In response, none of these individuals disclosed the intended

payments to Morris. When Aldus asked Loglisci directly whether Morris was getting paid,

Loglisci falsely denied that Morris was to be paid. Morris was aware of the misrepresentations

made to Aldus about his role.

64.     Loglisci's insistence on including Morris and Wissman as partners in Strategic

Co-Investment was simply a different means of funneling kickback payments to Morris and

Wissman. Morris and Wissman added no legitimate value to the venture and would not have

otherwise been included. For Strategic Co-Investment Management, the inclusion of Wissman

and Morris, who had no investment management background whatsoever, was simply the cost

of doing business with the Retirement Fund.

### Access Capital Partners

65.     In other instances, Morris, Loglisci and Wissman even hid Morris's involvement

from the investment managers who were paying the sham fees. In or about July of 2004,

Loglisci asked Wissman to locate a European investment opportunity for the Retirement Fund,

with the understanding that Wissman and Morris would be paid on the transaction. As a result,

Wissman approached Access Capital Advisors Ltd. ("Access Capital"), an investment

management firm specializing in the creation and management of funds that invest in European

private equity funds. In March 2005, Access Capital signed a written agreement to pay

Flandana, one of the Wissman Entities, an amount equal to 50 percent of any management and

performance fees that Access Capital earned on a Retirement Fund investment. Because of

Loglisci's insistence that Morris needed to be paid in connection with investments such as the

proposed transaction with Access Capital, Wissman planned on splitting his fees with Morris.

28

However, Morris was increasingly concerned during this period about concealing the payments to him in connection with the many Retirement Fund transactions that were in the pipeline. As a result, Wissman repeatedly assured Access Capital that he was not going to share the fees Access Capital paid to Flandana with anyone else even though Wissman had every intention of splitting those fees with Morris.

66.     After Wissman informed Loglisci that Access Capital had agreed to pay Wissman, Loglisci arranged for the Retirement Fund to invest over $500 million with Access Capital between March 2005 and April 2007 by purchasing limited partnership interests in the Access/NY European Middle Market Buyout Fund, L.P. ("Access Fund"), a fund managed by Access that invested in European private equity funds. As a result, Access Capital paid approximately $2.4 million to Flandana. Wissman then secretly transmitted about one-third of that amount, approximately $720,000, to Morris through Nosemote and Searle. Loglisci was not only aware of the fee-splitting arrangement between Wissman and Morris, but this arrangement was a precondition for the Retirement Fund to invest in the Access Fund. However, Loglisci failed to disclose these material facts to the IAC or anyone else at the Retirement Fund, and he thereby breached his fiduciary duty to the Retirement Fund.

**Payments To Political Allies**

67.     In addition to arranging payments to Morris, Loglisci and Morris also arranged for investment management firms to pay sham finder fees to Harding and other political allies in exchange for receiving Retirement Fund investments. Like Morris, Harding and these other individuals had no experience or training in investment management and provided no *bona fide* services in exchange for the payments. As described below, Loglisci and Morris played key

29

roles in extracting these other payments from investment managers and manipulated the Retirement Fund's decision-making process to ensure that those managers received Retirement Fund investments.

68.    In 2004 and 2005, Morris and Loglisci arranged for Harding, the former leader of the New York Liberal Party, to receive phony finder fees and a further illicit payment in connection with two Retirement Fund investments. Morris and Harding were longtime associates in New York politics. In April 2003, Harding became associated with Potomac, a Maryland-based broker-dealer. At or about the same time, Harding appealed to a senior official in the Comptroller's office for financial support and was referred to Morris. As a result of those and subsequent discussions, Morris and Loglisci arranged for Harding to receive payments in connection with the Retirement Fund's investments in funds managed by Paladin Capital Management, LLC ("Paladin") and Pequot Capital Management, Inc. ("Pequot"). Morris and Loglisci inserted Harding into these two transactions solely for the purpose of directing money to Harding, and Harding did not perform any *bona fide* finding or placement services for either Paladin or Pequot.

69.    Morris arranged with a senior executive at Paladin for a Paladin affiliate to retain Harding as a finder and agree to pay Harding an amount equal to 1.5 percent of any amount that the Retirement Fund invested with Paladin. Loglisci was aware of this arrangement and, as a result, he caused the Retirement Fund to invest with Paladin by purchasing a $20 million limited partnership interest in the Paladin Homeland Security Fund (NY), L.P. in May 2004. As a result of this transaction, the Paladin affiliate paid $300,000 to Harding.

70.    In 2005, Morris arranged for a finder retained by Pequot, which was already

30

working on a transaction with the Retirement Fund, to split his fees with Harding on that

transaction. Loglisci was aware of this arrangement and, as a result, Loglisci caused the

Retirement Fund to invest approximately $100 million in the Pequot Diversified Offshore Fund,

Ltd., a fund run by Pequot, in October 2005 and June 2006. Although Harding provided no

services whatsoever to Pequot or its finder, the finder secretly paid $505,000 to Harding, which

was approximately one-third of the total finder fee received by Pequot's finder.

71.     Loglisci and Morris also entered into an arrangement with a managing director of

GKM Newport Management, LLC ("GKM"), a private equity firm, for GKM to hire another

political ally ("Individual A") as its placement agent in exchange for receiving an investment

from the Retirement Fund. Although GKM's managing director had already secured a meeting

with the Comptroller's investment staff, GKM agreed to retain Individual A, despite the fact

that Individual A, a political operative and fundraiser, had no relevant experience and had never

acted as a finder. To ensure that GKM honored the arrangement, Loglisci made clear to GKM's

managing director that the Retirement Fund would not invest with GKM unless Individual A

was paid a substantial fee. GKM's managing director sent an e-mail to one of his partners

stating that Loglisci "made it clear to me that this deal is happening for us for one reason and for

one reason only and that is their relationship with [Individual A]."

72.     Over the next three years, Loglisci arranged for the Retirement Fund to invest

approximately $800 million with GKM by purchasing limited partnership interests in GKM/NY

Venture Capital Fund, L.P. ("GKM Fund"), a fund run by a GKM affiliate that invested in

venture capital funds. At the time of the Retirement Fund's initial investment, GKM had only

$13 million under management. In exchange for the Retirement Fund's investment, GKM paid

31

$658,000 in fees to Purpose, which was, in substance, jointly owned by Individual A and
Morris. Purpose then transferred approximately $477,000 to Individual A, leaving $181,000 for
Morris.

73.     The GKM affiliate invested in venture capital funds, and the Retirement Fund was
the only limited partner in the GKM Fund. The GKM affiliate was the general partner of the
GKM Fund, and the contract through which the Retirement Fund purchased the sole limited
partnership interest in the GKM Fund expressly stated that the GKM affiliate owed fiduciary
duties directly to the Retirement Fund. As described above, GKM and its affiliate consulted
directly with the Retirement Fund and, based on those consultations, created an investment
portfolio that was specifically designed to achieve the Retirement Fund's investment objectives.

### Carlyle/Riverstone Transactions

74.     As described above, after Loglisci first informed Wissman that investment
management firms must pay Morris in order to secure certain types of Retirement Fund
investments, Wissman entered into an informal partnership with Morris to extract and share
payments from investment managers seeking to do business with the Retirement Fund. The
private equity transactions described below further illustrate how Morris and Wissman worked
together to enrich themselves through their relationship with Loglisci.

75.     In or about July 2003, Wissman received a tip from Loglisci that the Retirement
Fund was interested in investing in energy sector funds, with the understanding that Wissman
and Morris would be paid on any such transaction. Wissman then contacted a neighbor who
was a former investment banker and had recently formed a private equity firm named
Riverstone Holdings LLC ("Riverstone"), of which Wissman's neighbor was a managing

director ("Riverstone Executive"). Riverstone was engaged in a joint venture with the Carlyle

Group ("Carlyle"), a larger private equity firm, to create a private equity fund that would invest

in energy companies, Carlyle/Riverstone Global Energy and Power Fund II, L.P.

("Carlyle/Riverstone Fund"). Wissman advised the Riverstone Executive that the

Carlyle/Riverstone Fund could obtain an investment from the Retirement Fund if it retained

Morris. After meeting with Morris on Wissman's instructions, the Riverstone Executive

arranged for Carlyle to retain Morris, through Searle, as a finder even though Carlyle had its

own in-house marketing operation and was spearheading the marketing efforts for the

Carlyle/Riverstone Fund. The Riverstone Executive understood that Morris intended to split the

finder fees with Wissman. In August 2003, Carlyle entered into a written agreement to pay

Searle two percent of any capital commitment that the Carlyle/Riverstone Fund received from

the Retirement Fund. According to the terms of the agreement between Carlyle and Searle,

Carlyle was responsible for paying the first 1.5 percent of the capital commitment to Searle and

Riverstone was responsible for paying the other 0.5 percent.

     76.     Even though Riverstone and Carlyle had previously managed only one small

energy fund together, Loglisci caused the Retirement Fund to invest a total of $500 million in

the Carlyle/Riverstone Fund pursuant to the foregoing arrangement. The Retirement Fund

purchased a $150 million limited partnership interest in the Carlyle/Riverstone Fund in

November 2003 and an additional $350 million interest in its successor fund in October 2005.

As a result, Riverstone and Carlyle paid Searle a total of $10 million between January 2004 and

May 2007. Searle then transferred $5 million to Wissman in a series of transfers involving

Tuscany, and 95 percent of the remaining $5 million went to Morris pursuant to his usual

33

arrangement with Searle.

77.     In addition to arranging for Morris and Wissman to be paid on the Retirement
Fund's transactions with the Carlyle/Riverstone Fund, the Riverstone Executive personally
invested $100,000 in *Chooch* to help Loglisci and his brothers market and distribute the film.
The Riverstone Executive made this investment in March of 2004. Although the Retirement
Fund had already made its first investment with the Carlyle/Riverstone Fund, Loglisci had not
yet committed to making the $350 million investment in the successor fund. In December 2005,
Loglisci also caused the Retirement Fund to invest an additional $30 million with Riverstone
and Carlyle by purchasing, through one of the previously described funds, a limited partnership
interest in a third private equity fund jointly managed by affiliates of Riverstone and Carlyle.
Approximately two months before this third investment was made, Carlyle agreed to pay
Morris, through Searle, an amount equal to two percent of any investments that the Retirement
Fund made in this third fund. As a result of the Retirement Fund's $30 million investment in
this third fund, Carlyle paid $600,000 to Searle, which in turn remitted $300,000 to Wissman in
a series of transfers involving Tuscany and $285,000 to Morris.

78.     Neither Loglisci nor anyone else ever disclosed the foregoing payments made to
Morris and Wissman or the Riverstone Executive's investment in *Chooch* -- and the resultant
conflict of interest -- to other members of the Comptroller's staff or to the IAC. Nor did
Loglisci ever disclose to other members of the Comptroller's staff or to the IAC that effecting
the payments to Morris and Wissman was a principal reason that Loglisci caused the Retirement
Fund to make these particular investments.

34

**Quadrangle Transaction**

79.    Loglisci also obtained a DVD distribution deal for *Chooch* from the subsidiary of an investment management firm that, at the time, was negotiating and soon wound up obtaining a $100 million investment from the Retirement Fund. In addition, Morris was paid as a "finder" on that transaction even though Loglisci was already negotiating the investment directly with the investment management firm by the time the firm "retained" Morris.

80.    In or about October 2004, a senior executive of Quadrangle Group LLC ("Quadrangle"), a private equity firm specializing in media and communications investments, met with Loglisci to solicit an investment for Quadrangle from the Retirement Fund. Loglisci reacted favorably to the solicitation and began taking the necessary steps to secure approval for a large Retirement Fund investment directly with Quadrangle. In or about December 2004 -- after Loglisci's meeting with the Quadrangle executive -- Morris met with the Quadrangle executive and solicited a finder fee arrangement between Quadrangle and Morris. Even though Quadrangle had already retained a placement agent, the Quadrangle affiliate that served as the general partner of the private equity fund in which the Retirement Fund invested, Quadrangle GP Investors II, L.P. ("Quadrangle GP"), entered into a written agreement, dated January 10, 2005, to pay Searle 1.1% of any amount invested by the Retirement Fund with that private equity fund, Quadrangle Capital Partners II Fund, L.P. ("Quadrangle Fund").

81.    Also in January 2005 -- very shortly after the Quadrangle GP-Searle agreement was signed -- a Quadrangle affiliate, GT Brands LLC, agreed to acquire the DVD distribution rights to *Chooch* for $88,841. Before this transaction occurred, Loglisci had arranged a meeting to discuss *Chooch* between one of Loglisci's brothers and the same Quadrangle executive with

35

whom Loglisci had met to discuss the proposed Retirement Fund investment. When the *Chooch*

DVD distribution deal was agreed upon, the Quadrangle executive immediately notified Morris

of that fact and the connection to Loglisci. Three weeks later, Loglisci personally informed the

Quadrangle executive that the Retirement Fund would be making a $100 million investment in

the Quadrangle Fund, which was managed by an affiliate of Quadrangle GP. The Retirement

Fund made the investment by purchasing a limited partnership interest in the Quadrangle Fund,

which invested in other companies through the purchase of securities and other means. The

investment closed in September 2005 and, as a result, Quadrangle GP paid Searle a total of

$1.125 million from October 2005 through June 2007, with Morris receiving 95 percent of the

total amount. Neither Loglisci nor anyone else ever disclosed the *Chooch* DVD distribution

agreement with the Quadrangle affiliate -- and the conflict of interest that it created -- to the IAC

or to other members of the Comptroller's staff. Nor did Loglisci or anyone else ever disclose

Morris's role in the Quadrangle investment to other members of the Comptroller's staff or to the

IAC.

### FIRST CLAIM FOR RELIEF

#### Violations of Section 10(b) of
#### the Exchange Act and Rule 10b-5

(Morris, Loglisci, Wissman, Harding, the Morris Entities,
the Wissman Entities, Meyer, Aldus, and Ramirez)

82.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 81.

83.     Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and

Aldus, as well as certain other investment management firms discussed above, directly or

36

indirectly, singly or in concert, by use of the means or instrumentality of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

84.     As part and in furtherance of the fraudulent scheme and other violative conduct described above, Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus, as well as certain other investment management firms discussed above, directly or indirectly, singly or in concert, knowingly or recklessly engaged in and/or employed the fraudulent and deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 1 - 6 and 26 - 81.

85.     The false and misleading statements and omissions made by Morris, Loglisci, Wissman, Meyer and Aldus, as well as certain other investment management firms discussed above, more fully described above in paragraphs 1 - 6 and 26 - 81, were material.

86.     Morris, Loglisci, Wissman, Meyer, and Aldus, as well as certain other investment management firms discussed above, knew or were reckless in not knowing that these material misrepresentations and omissions, more fully described above in paragraphs 1 - 6 and 26 - 81, were false or misleading, and Morris, Loglisci, Wissman, the Morris Entities, the Wissman

37

Entities, Meyer, and Aldus also acted with the requisite scienter by knowingly or recklessly engaging in the fraudulent scheme and other misconduct described above in paragraphs 1 - 6 and 26 - 81.

87.     By reason of the foregoing, Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus, singly or in concert, directly or indirectly, have each violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

88.     By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, Aldus, singly or in concert, directly or indirectly, also aided and abetted, and are therefore also liable for, each other's primary violations, and/or the primary violations committed by certain investment management firms discussed above, of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], because they each knowingly provided substantial assistance to such other Defendants' and/or such investment management firms' violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

89.     As more fully described above in paragraphs 1 - 6, 27 - 33 and 67 - 70, Harding also participated in violative conduct along with Morris and Loglisci by, among other things, soliciting Morris and senior officials in the Comptroller's office for payments in connection

with Retirement Fund investments and knowingly receiving sham finder fees and other undisclosed illicit payments as the result of transactions that Morris and Loglisci arranged for the purpose of directing money to Harding.

90. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Harding aided and abetted, and therefore is also liable for, the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by Morris and Loglisci as described in paragraphs 82 – 87, because Harding knowingly provided substantial assistance to their violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, Harding will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

91. As more fully described above in paragraphs 1 - 6, 27 - 33 and 46 - 49, Ramirez also participated in violative conduct along with Morris, Loglisci, Meyer, and Aldus, by, among other things, scheming with Morris to extract sham fee payments from Aldus and knowingly receiving a portion of the sham fees that Aldus paid to Morris to secure an investment from the Retirement Fund.

92. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Ramirez aided and abetted, and therefore is also liable for, the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by Morris, Loglisci, Meyer, and Aldus, as described in paragraphs 83 – 88, because Ramirez knowingly provided substantial assistance to their violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder

39

[17 C.F.R. § 240.10b-5]. Unless enjoined, Ramirez will again aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act**

(Morris, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus)

93.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 81.

94.     Morris, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly or recklessly, have:  (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

95.     As part and in furtherance of the fraudulent scheme and other violative conduct described above, Morris, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus, directly or indirectly, singly or in concert, knowingly or recklessly engaged in and/or employed the fraudulent and deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or

40

omitted to state the facts alleged above in paragraphs 1 - 6 and 26 - 81.

96.    By reason of the foregoing, Morris, Wissman, the Morris Entities, the Wissman
Entities, Meyer, and Aldus, singly or in concert, directly or indirectly, have each violated, and
unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**

(HFV Management and HFV Asset Management)

97.    The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 81.

98.    By reason of the conduct in which Wissman engaged, as more fully described
above in paragraphs 35 - 38 and elsewhere, HFV Management and HFV Asset Management,
directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use
of the means and instruments of transportation and communication in interstate commerce and
by use of the mails: (a) obtained money or property by means of untrue statements of material
fact or omissions to state material facts necessary in order to make the statements made, in light
of the circumstances under which they were made, not misleading; and/or (b) engaged in
transactions, practices or courses of business which operate or would operate as a fraud or deceit
upon the purchaser.

99.    By reason of the foregoing, HFV Management and HFV Asset Management,
singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate,
Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and § 77q(a)(3)].

41

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 206(1) and 206(2) of the Advisers Act

(Morris, Loglisci, Wissman, the Morris Entities,
the Wissman Entities, Meyer, Aldus, and Ramirez)

100.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 81.

101.    As described above, Aldus and certain other investment management firms

discussed above, directly or indirectly, knowingly or recklessly, by use of the mails or any

means or instrumentality of interstate commerce, while acting as investment advisers within the

meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], have:  (a) employed

devices, schemes, and artifices to defraud a client or prospective client; and/or (b) engaged in

transactions, practices, or courses of business which operate as a fraud or deceit upon a client or

prospective client.  As a result, Aldus and certain other investment management firms discussed

above violated Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-

6(2)].

102.    As part and in furtherance of the violative conduct described above, Aldus and

certain other investment management firms, directly or indirectly, knowingly or recklessly

engaged in and/or employed the fraudulent and deceptive devices, schemes, artifices,

transactions, practices and courses of business and/or made the material misrepresentations

and/or omitted to state the material facts alleged above in paragraphs 26 - 81.

103.    As alleged above, Morris, Loglisci, Wissman, the Morris Entities, the Wissman

Entities, Meyer, and Ramirez directly or indirectly, singly or in concert, knowingly or recklessly

42

also engaged in and/or employed the fraudulent and deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 26 - 81.

104.    By reason of the foregoing and pursuant to Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Ramirez, singly or in concert, directly or indirectly, aided and abetted, and are therefore liable for, the primary violations committed by Aldus and/or certain other investment management firms discussed above of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], because Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Ramirez each knowingly provided substantial assistance to such entities' violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].  Unless enjoined, Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Ramirez will again aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**FIFTH CLAIM FOR RELIEF**

**Violations of Sections 206(2) of the Advisers Act**

(HFV Management and HFV Asset Management)

105.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 81.

106.    By reason of the conduct in which Wissman engaged, as more fully described above in paragraphs 35 - 38 and elsewhere, HFV Management and HFV Asset Management, directly or indirectly, by use of the mails or any means or instrumentality of interstate commerce

43

and while acting as investment advisers within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon a client or prospective client.

107. By reason of the foregoing, HFV Management and HFV Asset Management, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining and restraining Morris, Loglisci, Wissman, Harding, the Morris Entities, the Wissman Entities, Meyer, Aldus, and Ramirez, and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Permanently enjoining and restraining Morris, Wissman, the Morris Entities, the Wissman Entities, Meyer, and Aldus, and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### III.

Permanently enjoining and restraining Morris, Loglisci, Wissman, the Morris Entities, the Wissman Entities, Meyer, Aldus, and Ramirez, and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting, violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### IV.

Permanently enjoining and restraining HFV Management and HFV Asset Management, and their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)] and Section 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### V.

Ordering each of the Defendants to disgorge the ill-gotten gains they received from the violations alleged herein, and to pay prejudgment interest thereon.

### VI.

Ordering Morris, Wissman, the Morris Entities, the Wissman Entities, and Meyer to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## VII.

Ordering Loglisci, Harding, and Ramirez to pay civil monetary penalties pursuant to

Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## VIII.

Ordering HFV Management and HFV Asset Management to pay civil monetary penalties

pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 209(e) of the

Advisers Act [15 U.S.C. § 80b-9(e)].

## IX.

Ordering Aldus to pay civil monetary penalties pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section

209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## X.

Granting such other and further relief as the Court deems just and proper.

Dated: May 12, 2009
      New York, New York

By: _____

David Rosenfeld
Associate Regional Director
New York Regional Office
Securities and Exchange Commission
Three World Financial Center
New York, New York 10281
(212) 336-0153

Of Counsel:
James Clarkson
George N. Stepaniuk
Todd Brody
Maureen F. Lewis
Joseph G. Sansone

46